**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **JIMMY HATFIELD** | **CIVIL ACTION** |
| **VERSUS** | **NO. 16-10933** |
| **DARREL VANNOY, WARDEN** | **SECTION: "E"(5)** |

## <u>REPORT AND RECOMMENDATION</u>

This matter was referred to the undersigned United States Magistrate Judge to conduct a hearing, including an evidentiary hearing, if necessary, and to submit proposed findings and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.    Upon review of the entire record, the Court has determined that this matter can be disposed of without an evidentiary hearing. *See* 28 U.S.C. § 2254(e)(2).    For the following reasons, **IT IS RECOMMENDED** that the petition for habeas corpus relief be **DISMISSED WITH PREJUDICE**.

### Procedural History

Petitioner, Jimmy Hatfield, is a convicted inmate currently incarcerated at the Louisiana State Penitentiary in Angola, Louisiana.    On October 25, 2012, following a four-day trial, he was found guilty as charged of second-degree murder.[1]    On December 18, 2012, his motion for a new trial was denied and the trial court sentenced him to life imprisonment at hard labor without benefit of probation, parole or suspension of sentence.

---

[1]  State Rec., Vol. 1 of 9, Minute Entry, 10/25/12.

His motion to reconsider the sentence was denied.[2]

Hatfield appealed, asserting nine claims total.    Pertinent to these federal habeas corpus proceedings, he claimed that the trial court erred in (1) denying his right to cross-examine pathologist, Dr. Richard Tracy, with a learned treatise, (2) denying his right to cross-examine state witness, Searle Brown, about an open warrant for his arrest and (3) denying his right to cross-examine state witness, Shante Whitley, about a pending felony charge. On July 2, 2014, the Louisiana Fourth Circuit Court of Appeal affirmed the conviction and sentence.[3]    On March 27, 2015, the Louisiana Supreme Court denied his application for a writ of certiorari.[4]

On June 17, 2016, he filed his federal application for habeas corpus relief.[5]    In that petition, he raises the aforementioned two grounds for relief presented on direct review. The State concedes that he has exhausted his remedies in the state courts and that the federal application is timely.    The State argues that his claims should be dismissed on the merits.[6] Hatfield has not filed a reply.

---

[2]  State Rec., Vol. 1 of 9, Minute Entry, 12/18/12; State Rec., Vol. 8 of 9, Transcript of Sentencing Hearing (December 18, 2012).

[3]  *State v. Hatfield*, 2013-KA-0813 (La. App. 4 Cir. 7/2/14), 155 So.3d 572 (Bonin, J., concurring); State Rec., Vol. 9 of 9.

[4]  State Rec., Vol. 9 of 9, *State v. Hatfield*, 2014-K-1648 (La. 3/27/15), 162 So.3d 383.

[5]  Rec. Doc. 3, Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus and Memorandum in Support (Rec. Doc. 3-1, p. 93).

[6]  Rec. Doc. 11.

**Facts**

The following facts were established at trial and summarized by the Louisiana Fourth

Circuit Court of Appeal:

> The victim was found dead inside the apartment of his girlfriend, Chiquita Spikes ("Ms. Spikes"), on April 10, 2010, from an apparent gunshot wound. Ms. Spikes testified at trial that she last saw the victim on the night of April 9, 2010, when she left the apartment to go out with her girlfriend. After homicide detectives interviewed Ms. Spikes, defendant (Ms. Spikes' former boyfriend) was identified as a suspect in the murder.

> Ms. Spikes testified that she had known defendant for seventeen or eighteen years; that they had been in a relationship; and that she had children with him. She said they broke up after Hurricane Katrina, but that defendant did not want to end the relationship. In May 2009, Ms. Spikes obtained a domestic restraining order against defendant based on allegations of battery.

> Ms. Spikes later began a relationship with the victim. At the time of his death, the victim was living with Spikes at her 14756 Chef Menteur Highway apartment in eastern New Orleans.

> Defendant was not allowed to see the couple's children at Ms. Spikes' apartment, and he did not have a key to the apartment. On April 9, 2010, Ms. Spikes took defendant to see their children at her mother's residence. Ms. Spikes testified that while they were at her mother's house, defendant asked her to give him a kiss and a hug. When she told him no, defendant complained that if he had been "that ni----" she would have given him a kiss and a hug. Ms. Spikes said defendant was referring to the victim. Ms. Spikes left her mother's to give defendant a ride home and to go out with a friend. Ms. Spikes agreed to allow defendant to use her car. She removed her house keys and the key to her mother's home from her key ring and gave defendant the key to her car.

> Ms. Spikes got out of her car at her friend's Ms. Whitley's, residence. Defendant drove off, and she and Ms. Whitley went out in Ms. Whitley's car to the Autocrat Social and Pleasure Club, where she encountered defendant. She and Ms. Whitley next went to the Carnival Club. She did not see defendant there. During this period of time, defendant called Ms. Spikes' cell phone numerous times. She and Ms. Whitley went on to the New Edition Club, where they again encountered defendant. Inside the club, defendant asked Ms. Spikes to dance and to give him a kiss, both of which requests she declined. He told her that if he had been "that ni---- in the club" she would have given him a kiss and a dance. Ms. Spikes told him to get away from her, and he pushed her face with

his hand such that her head hit the wall, and she was left with scratches on her face. Defendant then ran out of the club, and she ran after him. Ms. Spikes told a bouncer outside that defendant hit her and that she wanted her car keys back from him. The bouncer told her to stay in the club and that he would try to get her keys back, but he was unsuccessful.

Defendant subsequently came back inside the club with the car key in his hand, which he pushed against Ms. Spikes' neck. Defendant then ran out the back door. When Ms. Spikes left the club, defendant was standing across the street by her car staring at her. Ms. Spikes and Ms. Whitley left. Defendant continued to call Ms. Spikes repeatedly. Between 4:00 and 5:00 a.m. Ms. Spikes and Ms. Whitley arrived at the Waffle House on Read Boulevard in eastern New Orleans. While at the Waffle House, defendant left a message on Ms. Whitley's cell phone. Ms. Spikes said she did not return to her apartment that night, but stayed at 7856 Venice Boulevard.

Ms. Spikes called defendant in the early morning hours of April 10, 2010, because she wanted her car back. She reached him shortly after 7:00 a.m. At that time, defendant told her he could not talk to her because he had been shot, and he was talking to the police.

Ms. Spikes saw defendant later that day at her mother's residence, when he returned her car. Defendant told her that after he parked her car earlier that morning at his apartment complex in Metairie, he went back outside to check whether he had locked the doors. He said that he saw Hispanic males around her car, and that when he told them to get away, they shot him.

After getting her car back from defendant, Ms. Spikes returned to her apartment, wherein she noticed that the lock on the door was broken. Upon entering, she discovered the victim lying on the floor of the upstairs bedroom in a pool of blood. Ms. Spikes ran out the front door. Her cousin telephoned her as she ran out, and that cousin called the police. Ms. Spikes denied killing the victim. She stated that she did not notice anything missing from her apartment, and nothing was disheveled.

Ms. Spikes explained on cross examination that she and defendant had broken up and gotten back together, on and off again, multiple times. She confirmed that defendant was violent towards her. She stated that she and the victim had only been together a couple of months.

On redirect examination it was established from defendant's cell phone records that on April 10, 2010, Ms. Spikes called defendant prior to 2:11 a.m. and at 7:25 a.m. The records also reflect that defendant called Ms. Spikes a total of forty-five times, with twenty-three of them being made between 2:11

a.m. and 4:17 a.m.

Ms. Whitley testified that she was a friend of Ms. Spikes for over sixteen years. She described a tumultuous relationship between Ms. Spikes and defendant, including the May 2009 domestic incident, which Ms. Spikes described in her testimony. Ms. Whitley also corroborated the events of April 10, 2010, as testified to by Ms. Spikes. Specifically, she confirmed that defendant: 1) followed her and Ms. Spikes to various clubs that night; 2) had a physical altercation with Ms. Spikes at the New Edition Club; 3) repeatedly called Ms. Spikes during the night; and 4) called Ms. Whitley's cell phone, leaving a voicemail message, while she and Ms. Spikes were at the Waffle House between 4:00 a.m. and 5:00 a.m. Cell phone records produced at trial demonstrated that defendant called Ms. Whitley at 4:49 a.m.

The voice mail message left on Ms. Whitley's cell phone was played for the jury. Over the objection of defense counsel, Ms. Whitley answered the State's question as to what she understood defendant to say in the message. Ms. Whitley testified that defendant stated: "He's a real nasty ni----. He's not playing games and it's over with." After defendant left that message, Ms. Whitley called him back and, when defendant inquired about Ms. Spikes, she lied and told him Ms. Spikes was not with her anymore. Ms. Whitley eventually dropped Ms. Spikes off at Ms. Spikes' mother's home that morning.

Maryann Shiloh ("Ms. Shiloh"), the victim's mother, testified that she last spoke to the victim when he telephoned her at 2:30 a.m. on April 10, 2010, and he was in good spirits at that time. She telephoned him at approximately 6:15 a.m. later that morning after she had gotten to work. He did not answer. She tried calling him again later that evening when she got off from work. Someone answered the phone and hung up. She called right back, and a detective answered. He told her to go to Tulane Avenue and Broad Street, where she discovered that her son had been killed. Ms. Shiloh said the victim did not have a wallet, but he kept his personal belongings in a "little plastic thing" in which one would keep a social security card. After her son's funeral, Ms. Shiloh collected from Ms. Spikes a "plastic thing" in which the victim kept his belongings, which she identified at trial.

Jefferson Parish Sheriff's Office ("JPSO") Deputy Scott Hillburn ("Dep. Hillburn") testified that on April 10, 2010, he responded to a call from East Jefferson Hospital, where defendant was being treated for a gunshot wound to his leg. Dep. Hillburn testified on direct examination that he arrived at the hospital at approximately 7:45 a.m. However, on cross examination, he confirmed that he arrived at 6:45 a.m. Dep. Hillburn interviewed defendant in a trauma room, where he related the circumstances of a shooting in the parking lot of his apartment complex in Metairie. Defendant told Dep. Hillburn

that after he parked his car (Ms. Spikes' car) and went inside his apartment then he remembered that he forgot his iPod in the car. He went outside and saw three or four Hispanic males trying to break into the car. He shouted at them, and one of the men directed a slur at him. Defendant said he then heard two shots and ran. He said he hid behind a vehicle for fifteen minutes before going back to his vehicle to retrieve his iPod. It was at this time defendant said he noticed that he was shot, and he drove himself to East Jefferson Hospital. Defendant did not know exactly when he was shot, but he mentioned 2:00 a.m. and 3:00 a.m., and he also put the time as an hour before he got to the hospital.

Dep. Hillburn described the wound as what appeared to be a gunshot hole in the back of defendant's thigh. Dep. Hillburn said he checked to see if there had been any reports of gunshots in the time period when defendant had been shot, and there had been none. He instructed two JPSO deputies to go to defendant's parking lot; they found no spent cartridge casings, no gun, and no blood. The crime lab took photographs of defendant's wounds and processed his vehicle. Dep. Hillburn turned over the investigation to JPSO Detective Cedrick Gray ("Det. Gray"), who arrived at the hospital at approximately 8:30 a.m. After refreshing his recollection with his report, the deputy admitted that that there was nothing in it about defendant reporting that the shooting occurred at 2:00 a.m. or 3:00 a.m. Dep. Hillburn replied in the negative when asked on redirect examination whether defendant ever told him that he was shot while trying to buy drugs.

Det. Gray testified that he responded to the call from East Jefferson Hospital. Det. Gray said he ascertained that defendant was coherent by asking him for his name, address, and social security number, which were the same ones defendant had given to Dep. Hillburn. Defendant related that the previous evening he had gone to visit his girlfriend and their children and that at approximately 11:00 p.m. he left in his girlfriend's car. Defendant said he visited several clubs, one being the Autocrat Club; drove around a while; and went to a sandwich shop. Defendant said he then went home which, Det. Gray said, would have been 2:00 or 3:00 a.m., according to defendant's estimation. Det. Gray said he believed someone from the hospital contacted JPSO at approximately 6:30 a.m. about a patient with a gunshot wound.

Det. Gray testified that defendant related the same circumstances of the shooting as he described to Dep. Hillburn, regarding the Hispanic males in the parking lot of his apartment complex. Det. Gray said that the only report of gunfire that night had been one at approximately 3:00 a.m., four miles away—presumably meaning four miles away from where defendant said he had been shot. Det. Gray testified that defendant told him that when he got to the apartment that morning, he knocked on the door and his sister, Mona Hatfield ("Ms. Hatfield"), let him in. Defendant claimed he lived with his sister in her

apartment, but knocked on the door because he did not have a key.

Ms. Hatfield came to the hospital and spoke with Det. Gray before she spoke with defendant. Det. Gray testified that Ms. Hatfield told him that she had no contact with defendant since she left her apartment at around 4:00 p.m. the previous afternoon. She further said she had not spoken to him by phone, and she arrived home about 3:00 a.m. that same April 10, 2010 morning. Ms. Hatfield confirmed that defendant did not have a key to her apartment. She explained that she did not hear a knock on her door after she arrived home and did not let defendant inside.

Det. Gray testified that defendant never actually answered his question as to the inconsistency between his and his sister's stories. He said that when he asked defendant about this inconsistency, defendant became irate and was reluctant to give him information.

After defendant was released from the hospital, Det. Gray followed him back to the Metairie apartment complex and asked defendant to walk him through the events of the shooting. Defendant took the detective on the path he had taken when he ran over to hide behind a van. The van was still parked there. Defendant told Det. Gray he was about ten to fifteen yards away from his car when the shots were fired, but he was not sure where he was when he was shot. Det. Gray did not observe any blood around the van. Det. Gray said it was approximately fifty yards from the front of defendant's car to the van. Det. Gray noted that at about half that distance defendant could have taken a left turn to go hide behind the apartment complex or tried to go back into his apartment. Det. Gray canvassed the area but found no blood evidence, no spent cartridge casings, and no evidence of any bullet strike marks on the building or fence near where defendant said he hid. Det. Gray said defendant was still angry and reluctant to talk to him and that defendant became the most irate while showing him the van. Det. Gray said he explained to defendant that in order to investigate the crime with the goal of identifying the people who shot him, it would require his cooperation. At that point defendant told the detective he was not answering any more questions.

Det. Gray spoke with two unidentified individuals present at the apartment complex who claimed they heard no gunshots or disturbances that night. There were no surveillance cameras in the area. Det. Gray was later contacted by the New Orleans Police Department ("NOPD") with regard to a homicide investigation, and he provided them with the information gathered in his investigation of defendant's gunshot wound.

NOPD Homicide Detective Barrett Morton ("Det. Morton") was the lead investigator on the homicide case. He testified that the door to Ms. Spikes'

apartment had been breached. The victim appeared to have sustained one gunshot wound to the top of his head and one to his left shoulder. The lower part of his body was wrapped in bed linens like he had been in bed. Det. Morton testified that in a burglary there is usually some sort of breach, like a door being forced open. But he said that normally there are some signs of a search or ransacking, with drawers and cabinets opened and with objects of value missing. He said in the instant case there was absolutely no sign of a burglary, beyond the door having been forced open. He said one object that stuck out was a video game console that he believed would have been taken in a burglary. He said that Ms. Spikes was never a suspect, although he interviewed her. She cooperated with the investigation. Defendant was developed as a suspect based on information given by Ms. Spikes.

Det. Morton obtained defendant's cell phone number and a map of cell tower locations, which he identified at trial. He said he determined from these documents that calls defendant made after 4:00 a.m. bounced off "[t]he Michoud tower" in eastern New Orleans. Det. Morton recalled that defendant said he returned home to his Metairie apartment at 6:00 a.m. or so. Defendant told Det. Morton that he was confronted by two Hispanic males attempting to burglarize his car; one of the males shot him. He also told Det. Morton that he discarded the clothing he was wearing when shot in a dumpster at the apartment complex. Det. Morton explained that the articles of clothing were retrieved from the dumpster. The clothing was bloody, but there were no bullet holes consistent with a shooting.

Det. Morton testified that some information defendant gave to JPSO Det. Gray was inconsistent with what defendant told him, such as the location of the shooter; the description of the perpetrators; and that he told JPSO that he went to his car to retrieve his iPod, while telling Det. Gray that he went out to make sure the car was locked.

Det. Morton confirmed that Ms. Whitley, who was with Ms. Spikes on the evening in question, played for him a voice mail message defendant left on her phone around 4:50 a.m., which, according to the detective, "said basically, 'I'm a real ni----. I handle mine,' words to that effect, and 'It's over now. It's over.' " Det. Morton said defendant's cell phone location at 4:50 a.m. was around the intersection of Interstate 10 and Little Woods (in eastern New Orleans), heading, if the detective recalled correctly, toward the homicide location.

On cross examination, Det. Morton acknowledged that the time of the victim's death was very important to his investigation. He admitted that he had not talked to the pathologist who performed the autopsy on the victim before he prepared his application for an arrest warrant for defendant. Det. Morton confirmed that a gunshot residue "test" was performed on defendant and on

Ms. Spikes. He confirmed on redirect examination that because of the passage of some hours, after defendant had been first to the hospital, then home, and he was no longer wearing the clothes he had been wearing earlier, he did not submit the gunshot residue ("GSR") (apparently meaning he did not submit the swab(s) taken of defendant's hands for testing) because "it would have never have been accurate." He also testified on redirect examination that he did not have the GSR test run on the swab(s) taken from Ms. Spikes because of the passage of time, basically for the same reason he did not complete the GSR testing process with defendant.

Det. Morton also confirmed on cross examination that defendant said nothing in his statement about being shot at 4:00 a.m., although Det. Morton admitted that in his report he stated that defendant made a comment about having been shot at 4:00 a.m. outside his apartment in Metairie.

Det. Morton confirmed that a check of Ms. Spikes' cell phone records against the cell phone tower map confirmed that she was at the Waffle House when she said she was there and afterward was at her mother's home when she said she was there. This verification was another reason he did not forward Ms. Spikes' GSR swab(s) for analysis. Det. Morton confirmed that after interviewing Ms. Spikes, he had defendant arrested for domestic abuse battery based on Ms. Spikes' allegations as to what had occurred in the New Edition club.

NOPD Sergeant Kevin Burns Jr. ("Sgt. Burns") testified that he assisted Det. Morton in the homicide investigation. Sgt. Burns went to the scene on April 10, 2010. The dead bolt on the door was broken and on the ground. Ms. Spikes was sitting on some stairs across from the crime scene. She was calm, but appeared to be in shock. He spoke to her. She was never developed as a suspect in the killing. Det. Morton alerted Sgt. Burns that defendant was a possible suspect and his location. Sgt. Burns picked defendant up and transported him to the homicide office.

Sgt. Burns advised defendant of his *Miranda* rights and took a verbal statement from him. Defendant admitted that he did have a verbal confrontation with Ms. Spikes at the New Edition Club. He denied following her home. He said he went to a sandwich shop, which the detective believed was at Elysian Fields and St. Claude Avenues. Defendant denied having relocated to eastern New Orleans. He said he went straight home to his Metairie apartment, arriving there at approximately 4:00 a.m. Defendant also related the episode with the Hispanic males.

Sgt. Burns confirmed on cross examination that he did not write a report in the case. He stated that Ms. Spikes told him that the last time she spoke to the

9

victim was on the phone, at approximately 5:00 p.m. on April 9, 2010; that it had been a short conversation; and the victim had been angry with her the last time they spoke. Ms. Spikes related that the last time she saw the victim was at her apartment at approximately 7:00 p.m., when she went home to retrieve some of her personal belongings in order to be able to get ready to go out for the night.

NOPD Homicide Detective Anthony Pardo ("Det. Pardo") testified that he assisted Det. Morton in the instant case. He recovered some clothing contained in a Jefferson Parish hospital bag from a dumpster located at defendant's apartment complex. Det. Pardo identified crime scene photographs of the apartment complex; the dumpster; and the bag of clothing, containing bloody jean shorts, plaid boxer shorts, and two socks. Upon examination of the boxer shorts and the jean shorts, Det. Pardo stated that he did not see any holes in the clothing that would correspond to bullet holes.

NOPD Technician Shaheed Muhammad ("Mr. Muhammad") testified that he assisted in the investigation at the victim's apartment on April 10, 2010. He noted that the door to the apartment had apparently been kicked in. Otherwise, the first floor was undisturbed. The victim was upstairs in the first of three bedrooms. The upstairs was relatively clean. Besides the bedroom where the body of the victim was found, there was no evidence of a disturbance or a struggle in any other room. Mr. Muhammad identified his report in the case, the photographs he took at the scene, two spent PMC brand .32 auto caliber casings that Mr. Muhammad collected at the scene, two pieces from the broken door lock, and the GSR swab that Mr. Muhammad took from Ms. Spikes' hands.

Marilyn Dilley ("Ms. Dilley"), the custodian of records for Sprint, identified State Exhibit 110 as a call detail record, including cell phone tower sites, for defendant's cell phone number. Ms. Dilley further identified State Exhibit 111 as a list of all cell phone tower sites served by Houston Switch, which were the cell tower sites cited on State Exhibit 110. Ms. Dilley reviewed a number of call entries, noting the times, numbers called, and cell towers off which the calls had pinged. Ms. Dilley next identified Ms. Spikes' cell phone records, again reviewing a number of calls to that number from defendant's number and the cell towers off which those calls pinged.

Searle Brown ("Mr. Brown")[7]  was called by the State. He testified that he was

---

[7]  Mr. Brown was on parole since 2009 for his 2007 convictions for forgery and drug possession. He admitted two other prior convictions from 2001 and 2003, respectively, for possession of cocaine and for issuing a check with insufficient funds.

asleep in the early morning hours of April 2010, when defendant telephoned him and proceeded to tell him: "Man this bitch ass ni---- got into it." Mr. Brown said defendant never said the individual's name, but when Mr. Brown was asked by the prosecutor whether defendant referred to the person he had got into it with in any other way, Mr. Brown replied: "Oh, 'The bitch ass ni---- that,' you know, 'my baby momma messing with.' " Mr. Brown said defendant told him he was "hit." Mr. Brown asked defendant what he meant, whether the person had tried to hit him in a car or something or with a stick or bat, etc. He said defendant replied: "No, I'm bleeding." When Mr. Brown asked him what he meant, defendant said: "Man, I think I'm shot." Defendant elaborated that a gun had discharged as he was trying to get it out of his pocket or waistband or something like that. Mr. Brown told defendant he did not want to get involved; that he needed to get off the phone; and he asked defendant why he was phoning him, telling him that he needed to go to the hospital. Mr. Brown said he recalled a question being asked as to where defendant's "baby momma" was while this was going on, and defendant replied that she had not been there.

The prosecutor asked Mr. Brown to highlight his phone number on an exhibit—presumably State Exhibit 54, a blowup of defendant's cell phone records—confirming that the call from defendant to Mr. Brown was at 6:10 a.m. Mr. Brown also highlighted his phone number on the exhibit a second time, for a call at 9:40 a.m. When asked by the prosecutor whether he remembered defendant calling him back, Mr. Brown said: "Kind of, yeah, I kind of remember."

Mr. Brown denied on cross examination that defendant contacted him and actually came over to his residence again and again, asking him to sell defendant marijuana, but that he, Mr. Brown, was mad because defendant owed him money. Defense counsel asked Mr. Brown whether defendant had offered him an iPod as payment for the money defendant owed him and whether he then shot defendant in the leg to teach him a lesson. Mr. Brown denied all these allegations.

Mr. Brown's parole officer, Tonya Ramsey, confirmed Mr. Brown's cell phone number. She had been supervising Mr. Brown since November 2010, and she said there was nothing in his record, even from 2009, to suggest that he had been selling drugs at any time since he had been on parole.

Richard Tracy, M.D. ("Dr. Tracy") conducted the autopsy on the victim. He identified his autopsy protocol/report in the case. There were two gunshot entry wounds in the victim's body, one being fatal. There was no sign that either of the two bullets had been fired from within eighteen inches. Dr. Tracy said that, based on the body being discovered at 7 p.m., and the lividity (the

gravitational settling of the blood in the body), he opined that the body had been face down for at least four to six hours before it was found. He confirmed that it could be not excluded that death occurred as early as 4:00 a.m. on April 10, 2010, the day the body was discovered, to as late as four to six hours before it was found. Dr. Tracy also confirmed that he could not scientifically exclude the victim having been killed between the hours of 5:00 a.m. and 5:30 a.m.

On cross examination, Dr. Tracy stated that he could not exclude the possibility that the victim died sometime after 9:00 a.m. Dr. Tracy confirmed on cross examination that when he spoke to defense counsel in a meeting on July 11, 2012, he typed out his conclusions and signed them. He conceded that he may have said in that statement that the victim died sometime after 9:00 a.m., but he maintained at trial that he had been speaking out of turn and that it could not be determined from the physical findings. Defense counsel brought out that Dr. Tracy previously stated that "[i]t is outside of the range of possible at 4:00 am." Dr. Tracy said the wording was crude and that he should have written "before 4:00 a.m." instead of "at 4:00 am." Dr. Tracy testified that he could not exclude the outside time of death as early as 4:00 a.m. But he also said that he could not exclude the possibility that the victim died sometime after 9:00 a.m. He also confirmed that he said it was most likely that the victim died somewhere in the middle of the range, but he said that was a crude judgment call.

Dr. Tracy ultimately confirmed on cross examination that his best guess was that the victim died somewhere in the middle of the range between 9:00 a.m. and 4:00 p.m., such as around 11:00 a.m. or 12:00 p.m., and that this conclusion was based entirely on lividity. However, Dr. Tracy again confirmed on redirect examination that he could not scientifically exclude the possibility that the victim was killed between 5:00 a.m. and 5:30 a.m.

New Orleans EMS Paramedic Jordan Ehrich ("Mr. Ehrich"), testifying for the defense, stated that he arrived on the scene of the homicide around 8:00 p.m. on April 10, 2010. He said the victim's body had begun to stiffen and that it was in the beginning stages of rigor, a fact he noted in his report.

Mr. Ehrich admitted on cross examination that he had no training in the field of lividity and rigor, nor was he in any way an expert in such field. Mr. Ehrich explained that the purpose of putting in his report the notation of rigor mortis was to document that the individual had been down for an extended period of time and that resuscitation efforts would be futile; it had nothing to do with estimating the time of death. He said that he would defer to the coroner on time of death.

Collie Trant, M.D. ("Dr. Trant"), testifying for the defense, was qualified by

stipulation as an expert in anatomic and forensic pathology. It was his opinion that the victim did not die before noon on April 10, 2010. He based his opinion on two facts: (1) the paramedic arriving at 8:02 p.m. and noting in his report that there was early rigor mortis, which is the hardening of the muscles; and (2) Dr. Tracy's report noting that there was anterior and posterior livor mortis, which is the settling of the blood to give a red color to the surface to which the blood is settling. Dr. Trant believed that because rigor was not fixed, it was early, and thus the time of death had been "maybe" five to eight hours before the paramedic noted the early rigor.

As for the livor mortis, Dr. Trant said that Dr. Tracy's autopsy report noted both anterior and posterior livor mortis. Thus, Dr. Trant stated lividity had not been fixed by the time the body—which was discovered face down and apparently had not been moved after the time of death—was turned over by authorities and transported to the morgue, where it was left face up overnight, allowing for some settling of blood in the body to the posterior side. Dr. Trant said the medical literature established that it takes eight to twelve hours for lividity to become fixed. He said lividity had been partially fixed, and so the body had been lying face down for less than eight to twelve hours. He said it could have been seven to eleven hours "or something like that." Dr. Trant did not believe that the victim lived very long after being shot in the head.

Dr. Trant conceded on cross examination that some studies showed that lividity can take up to eighteen to twenty-four hours to become fixed. However, he said that was not routine. He also conceded that some reports stated that it could take twenty-four hours for rigor mortis to fully develop. However, he confirmed that he had incorporated those reports in reaching his conclusions in the instant case. He admitted that he could not say with one hundred percent certainty that the victim was not killed between the hours of 5:00 a.m. and 5:30 a.m. Dr. Trant confirmed on cross examination that he did not actually inspect the body.

Dr. Trant stated on redirect examination that his estimate that in 95.5 percent of cases rigor mortis fully develops in six to ten hours was based on a bell curve of study figures. With regard to the cases in which full rigor mortis might develop earlier, Dr. Trant indicated that heat would be factor speeding up the development of rigor. But, he confirmed that all of the time estimates he had been talking about assumed "room temperature," although "room temperature" was never defined by him. Dr. Trant saw no indication that the police noted the temperature of the room, nor did the autopsy report reflect that the temperature of the body had been taken. Dr. Trant reiterated that, in his opinion, the time of the victim's death was sometime after noon.

James Traylor, M.D. ("Dr. Traylor"), qualified by stipulation as an expert in the

field of forensic pathology, testified on rebuttal for the State. Dr. Traylor confirmed that he reviewed the victim's autopsy protocol/report. Dr. Traylor defined lividity, as the term was being discussed in the instant case, as gravity-dependent settling of blood after death. He defined rigor as the stiffening of muscles after death. He explained that one can usually detect rigor within an hour or two after death and that rigor becomes fully formed in the twelve hours following death, and in the next twelve hours it begins to lessen. He said that once rigor is "broken" with marked difficulty, it does not reform. He said both lividity and rigor were temperature dependent.

When Dr. Traylor was asked by the prosecutor whether there was anything in Dr. Tracy's autopsy protocol/report or the paramedic's report, from which he could say scientifically excluded that the victim was killed between 5:00 a.m. and 5:30 a.m. on April 10, 2010, Dr. Traylor answered that he could not "definitively exclude" that time frame, concluding his answer by saying: "It's just too close."

Dr. Traylor testified that he could not gauge rigor from a photograph shown him by the prosecutor, stating that would be something he would have to physically feel. However, he noted that when Dr. Tracy performed the autopsy some thirteen hours later, he described the rigor as broken with marked difficulty. As to lividity, Dr. Traylor noted that Dr. Tracy had noted anterior and posterior lividity. He further noted that one could see lividity in one of the crime scene photographs of the victim lying face down.

Dr. Traylor referred to lividity being almost fixed, but said it could not have been totally fixed because there would not have been any posterior lividity. Dr. Traylor then stated:

> So, in general you got eight to twelve hours. Now if you say, you know, they're saying what, 5:00 or 5:30, if you go back a full twelve hours and you're at 8:00 o'clock in the morning, this tells me that the individual was alive.

Dr. Traylor said he had no idea how long the victim may have lived after being shot, commenting that "it's possible he could have lived fifteen minutes, half an hour or an hour. I don't know." He noted that the victim did breathe for a while after being shot, based on the bloody frothing at the victim's nose, which, he said, "now narrows that time frame back behind 8:00 o'clock. So could it be 5:00 or 5:30? If that's what you're asking me to work with, I cannot exclude it."

Dr. Traylor confirmed on cross examination that in an email to him, defense counsel had asked him about his statement, "that you think the decedent may have died five to six hours from the time the body was found, meaning around

2:00 or 3:00pm [sic] in the afternoon on 4/10." Dr. Traylor read for the jury the response he had emailed to defense counsel: "Correct, based on shifting of lividity and onset of rigor." Dr. Traylor explained that he now had more information. He confirmed that at the time he made that statement, he had Dr. Tracy's autopsy protocol/report and the paramedic report, but had not seen any photographs except the gunshot photographs.

On redirect examination, the prosecutor asked Dr. Traylor if he could scientifically exclude the possibility that the victim was shot and killed at 5:00 a.m. to 5:30 a.m. on April 10, 2010, and Dr. Traylor replied: "I cannot." Dr. Traylor further stated on cross examination that he could not exclude that the time of death could have been a little later, like 8:00 a.m.

Over the defense's objection as to improper rebuttal testimony, the State questioned Dr. Traylor about the bullet wound in defendant's thigh. Dr. Traylor testified that, based on photographs of defendant's leg taken in the hospital, showing the entrance and exit wounds from the bullet, defendant could not have received the gunshot wound in his thigh from someone standing even a few feet away. He opined that the muzzle of the gun had been approximately one inch from the skin when the gun was fired. Dr. Traylor described the general trajectory of the wound as top to bottom, right to left, and front to back, and he said it was not consistent with someone walking up to the victim and shooting him in the leg from even a couple of feet away. He stated it would be more possible that the wound could have been sustained if the victim had been carrying a gun in his waistband and running, and it discharged while he was running. That would explain why there was no hole in defendant's pants/shorts or why there was no soot or anything else except around the wound. Dr. Traylor believed it could be a possibility that defendant was going for a gun or putting a gun back into his waistband and it discharged.[8]

### Standards of Review on the Merits

Title 28 U.S.C. § 2254(d)(1) and (2), as amended by The Antiterrorism and Effective

Death Penalty Act of 1996 (AEDPA), provides the applicable standards of review for pure

questions of fact, pure questions of law, and mixed questions of both.    A state court's purely

factual determinations are presumed to be correct and a federal court will give deference to

---

[8]  *State v. Hatfield*, 155 So.3d at 577-587 (citation omitted) (footnote in original).

the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); *see also* 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."). With respect to a state court's determination of pure questions of law or mixed questions of law and fact, a federal court must defer to the decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

The "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning." *Bell v. Cone*, 535 U.S. 685, 694 (2002). A state-court decision is "contrary to" clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the United States Supreme Court's cases or if the state court confronts a set of facts that are materially indistinguishable from a decision of the United States Supreme Court and nevertheless arrives at a result different from United States Supreme Court precedent. *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000); *Wooten v. Thaler*, 598 F.3d 215, 218 (5th Cir.), *cert. denied*, 131 S.Ct. 294 (2010). An "unreasonable application" of [United States Supreme Court] precedent occurs when a state court "identifies the correct governing legal rule... but unreasonably applies it to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 407-08; *White v. Woodall*, 134 S.Ct.

1697, 1706 (2014).

It is well-established that "an unreasonable application is different from an incorrect one." *Bell*, 535 U.S. at 694.    A state court's merely incorrect application of Supreme Court precedent simply does not warrant habeas relief.    *Puckett v. Epps*, 641 F.3d 657, 663 (5th Cir.2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable.").    "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable" under the AEDPA.    *Harrington v. Richter*, 562 U.S. 86, 102 (2011).    Section 2254(d) preserves authority to issue the writ in cases where there is "*no possibility* fairminded jurists could disagree that the state court's decision conflicts with [United States Supreme Court] precedents."    *Harrington*, 562 U.S. at 102 (emphasis added); *see also Renico v. Lett*, 559 U.S. 766, 130 S.Ct. 1855, 1866 (2010) ("AEDPA prevents defendants—and federal courts—from using federal *habeas corpus* review as a vehicle to second-guess the reasonable decisions of state courts.").

## Analysis

### A.  Limitation on Cross-Examination of Dr. Richard Tracy

Hatfield claims that his Sixth Amendment right to confront witnesses was denied when the trial court improperly restricted his cross-examination of Dr. Richard Tracy regarding a learned treatise.[9]    On direct appeal, the Louisiana Fourth Circuit denied this claim.    The court of appeal found the limitation proper, and concluded that even if a

---

[9]  Rec. Doc. 1-1, p. 13.

confrontation error existed, the guilty verdict was not attributable to that error.    The

appellate court reasoned:

> Next, defendant argues that the trial court erred in denying him the right to cross examine Dr. Tracy, who performed the autopsy on the body of the victim, using a "learned treatise," which evidence, defendant argues, was expressly admissible as an exception to the rule against hearsay under La. C.E. art. 803(18).
>
> Generally, the Sixth Amendment to the U.S. Constitution guarantees the right of an accused in a criminal prosecution "to be confronted with the witnesses against him...." The main and essential purpose of confrontation is to secure the opportunity of cross examination. *Davis v. Alaska*, 415 U.S. 308, 315–16, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974). In addition, La. Const. Art. I, § 16 states, in pertinent part, that "[a]n accused is entitled to confront and cross-examine the witnesses against him...." La. C.E. art. 611(B) provides that a witness in a criminal case may be cross examined on any matter relevant to any issue in the case.
>
> La. C.E. art. 803(18) states:
>
> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> * * *
>
> Learned treatises. To the extent called to the attention of an expert witness upon cross-examination or, in a civil case, relied upon by him in direct examination, statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art, established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice. If admitted, such a statement may be read into evidence and received as an exhibit but may not be taken into the jury room.
>
> In the instant case, defense counsel elicited from Dr. Tracy on cross examination that, as a pathologist, Dr. Tracy taught the subject matter and used the book, Medicolegal Investigation of Death, by Werner Spitz. Dr. Tracy confirmed upon further cross examination that the book was considered to be "a preeminent book in [his] field" and was "the kind of book that many pathologists all over the country rely upon." The State objected to defense counsel "putting a book into evidence." Defense counsel responded by stating that it was a learned treatise, whereupon the court asked counsel to approach

the bench, and an unrecorded bench conference was held. After the conclusion of the bench conference, defense counsel asked the court to note for the record her objection to not being allowed to use the treatise.

The State's sole objection was to defense counsel's putting the book in evidence. La. C.E. art. 803(18) refers to calling an expert witness' attention to "statements contained in published treatises," and states that "[i]f admitted, such a statement may be read into evidence and received as an exhibit...." However, the objection is fairly read as directed to the introduction into the record or reading "into evidence" of any portion of the treatise.

The State first argues that defendant failed to preserve the issue for appellate review as required by La. C.E. art. 103(A)(2), which states that error may not be predicated upon a ruling excluding evidence unless a substantial right of the party is affected, and "[w]hen the ruling is one excluding evidence, the substance of the evidence was made known to the court by counsel." This requirement of La. C.E. art. 103(A)(2) contemplates, *inter alia*, the sort of procedure described in La. C.C.P. art. 1636, either permitting the party offering such evidence to either make a complete record thereof or permitting the party to "make a statement setting forth the nature of the evidence." See, Pugh, Force, Rault & Triche, Handbook on Louisiana Evidence Law, Authors' Note (4) to La. C.E. art. 103, p. 346 (2013).

In the instant case, after Dr. Tracy concluded his testimony, and during a break in the testimony, and with the jury out of the room, the trial court directed defense counsel to perfect the record as to the earlier issue concerning the learned treatise with whatever argument or reasons given by defense counsel to be considered as if given contemporaneously to the sustaining of the State's objection—and to defense counsel's notation of an objection to the trial court's contemporaneous sustaining of that objection by the State. Defense counsel stated that the questions she would have asked of Dr. Tracy were to show that what the learned treatise said was "diametrically opposed to what the Doctor said on the stand." Defense counsel further stated:

MS. BESKIND [DEFENSE COUNSEL]:

[W]hat Werner Spitz says is essentially that lividity is fixed after eight to ten hours. Therefore, it simply would not be possible to see the dual lividity on the body that Dr. Tracy testified to after more than ten hours from when the body is found, which was—is a very essential point from the defense.

THE COURT:

> All right. That objection is preserved. You can supplement into the record [sic] whatever you, you know, what excerpt you wanted from the book. That objection's preserved.

Defense counsel apparently never proffered any excerpts from the learned treatise she wished to use in cross examining Dr. Tracy. However, the trial court did not direct her to do so. Defense counsel clearly made a statement setting forth the substance of the part of the learned treatise with which she had planned to cross examine Dr. Tracy—essentially that lividity is fixed after eight to ten hours. Thus, the issue was properly preserved for review. That defense counsel did not proffer Dr. Tracy's "expected" testimony is irrelevant. The learned treatise, more particularly the part of it that defense counsel sought to use in her cross examination, was the evidence excluded.

As to the merits of the assignment of error, the State argues that the trial court did not abuse its discretion in excluding the evidence. Generally, a trial court's ruling as to the admissibility of evidence will not be disturbed absent an abuse of discretion. *State v. Cyrus*, 2011–1175, p. 20 (La. App. 4 Cir. 7/5/12), 97 So.3d 554, 565 (citing *State v. Richardson*, 97–1995, p. 14 (La. App. 4 Cir. 3/3/99), 729 So.2d 114, 122).

The State correctly asserts that although Dr. Tracy agreed on cross examination that the treatise was a preeminent book in the field and that he had used it, he also added: "[B]ut I would hate to see it in evidence." The State argues that because of what it characterizes as Dr. Tracy's "equivocation" (that he would hate to see the treatise in evidence), the trial court did not abuse its discretion in determining that the defense had not established through Dr. Tracy that the treatise was a "reliable authority." It is not known precisely why the trial court refused to admit the evidence. While Dr. Tracy agreed that the treatise at issue was preeminent in its field and was "the kind of book that many pathologists all over the country rely upon," he did express a reservation as to seeing the book in evidence. While the State objected at that point and Dr. Tracy did not further elaborate on why he "would hate to see it in evidence," it cannot be said the trial court abused its discretion in being of the opinion that Dr. Tracy did not believe the treatise was a "reliable authority" as contemplated by La. C.E. art. 803(18).

Finally, even assuming the trial court erred in sustaining the State's objection, confrontation errors are subject to the harmless error analysis. *State v. Scott*, 2012–1603, p. 16 (La. App. 4 Cir. 12/23/13), 131 So.3d 501, 510–11; *State v. Jones*, 2012–0891 p. 35 (La. App. 4 Cir. 8/7/13), 122 So.3d 1065, 1084. An error is harmless if it can be said beyond a reasonable doubt that the guilty verdict rendered in the case was surely unattributable to that error. *Scott*, 2012–1603, p. 16, 131 So.3d at 510–11.

As noted by the State, during the cross examination of its rebuttal witness, expert forensic pathologist Dr. Traylor, defense counsel questioned him concerning email communications that defense counsel had with the doctor in advance of trial. Defense counsel noted that Dr. Traylor had faxed him information about lividity and rigor, including "a chapter from Spitz and Fisher," a book that Dr. Traylor confirmed he taught in his class. Defense counsel further asked Dr. Traylor if the book, which counsel named as "The Medicolegal Investigation of Death," was one of the most well-regarded treatises on the subject in the country. Dr. Traylor confirmed that it was, and he had earlier confirmed on cross examination that "Werner Spitz" was incredibly well-respected; that the treatise was a very good textbook; and that he liked it. Dr. Traylor stated that the chapter he faxed to defense counsel was on post-mortem changes, and the doctor confirmed that the chapter from the book stated that lividity is usually fixed after eight to twelve hours, but that those times were temperature dependent.

Defense counsel thoroughly cross examined Dr. Traylor about the estimates of the time of death based on lividity. The jury heard during the cross examination of State expert forensic pathologist Dr. Tracy the name of the treatise as "Werner Spitz's Fourth Edition Medicolegal Investigation of Death," before the trial court sustained the State's objection to the admissibility of the treatise. And the jury was extensively apprised of the time estimates concerning the fixing of lividity contained in that treatise, and the application thereof to the facts and circumstances of the victim's death, during the testimony of Dr. Traylor.

In addition, Dr. Tracy's final word on cross examination as to the time of the victim's death was that his "best guess" was that the victim died somewhere in the middle of the range between 9:00 a.m. and 4:00 p.m., such as around 11:00 a.m. or 12:00 p.m., and that this conclusion was based entirely on lividity. A time of death of 12:00 p.m. would be eight hours before the victim's body was discovered by authorities (after Ms. Spikes discovered it and called them). Defense counsel stated that the evidence from the learned treatise with which he wished to confront Dr. Tracy was that lividity becomes fixed at eight to ten hours. Thus, the ultimate "best guess" by Dr. Tracy as to the time of death, which, he said, was based exclusively on lividity, was entirely consistent with what defendant's learned treatise said.

It is true that Dr. Tracy confirmed on redirect examination that he could not scientifically exclude the possibility that the victim was killed between 5:00 a.m. and 5:30 a.m. However, none of the three expert forensic pathologists who testified in the instant case, including defendant's own expert, Dr. Trant, could exclude the possibility that the victim was killed between 5:00 a.m. and 5:30

a.m.

Thus, even if it were assumed that the trial court abused its discretion in sustaining the State's objection to defense counsel's use of the purported learned treatise in the examination of Dr. Tracy, considering all of the evidence, facts, and circumstances, it can be said beyond a reasonable doubt that the guilty verdict rendered in the instant case was surely unattributable to any such error. Thus, any such error was harmless.[10]

The Louisiana Supreme Court likewise denied relief without assigning additional reasons.

The Sixth Amendment Confrontation Clause guarantees a criminal defendant the right of confrontation, the main purpose of which is to secure an opportunity to cross-examine witnesses. U.S. Const. amend. VI; *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986). That opportunity is paramount, as the Supreme Court has explained:

Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, i.e., discredit, the witness.

*Davis v. Alaska*, 415 U.S. 308, 316 (1974).

As the Supreme Court emphasized in *Van Arsdall*, " 'we have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination.' " *Van Arsdall*, 475 U.S. at 678–79 (quoting *Davis v. Alaska*, 415 U.S. 308, 316–17 (1974)). "[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on

---

[10] *State v. Hatfield*, 155 So.3d at 589-593.

the part of the witness, and thereby 'to expose to the jury the facts from which jurors ... could appropriately draw inferences relating to the reliability of the witness.' " *Id.* at 680 (quoting *Davis*, 415 U.S. at 318) (omission in original).

Though paramount, cross-examination is not without limitations. Trial judges retain wide latitude to impose reasonable limits on cross-examination. The United States Fifth Circuit has summarized the controlling law with respect to those limitations as follows:

> [T]he Confrontation Clause of the Sixth Amendment guarantees the right of the accused in a criminal proceeding to be confronted with the witnesses against him. *Delaware v. Van Arsdall*, 475 U.S. 673, 678, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). Thus, a criminal defendant has a constitutional right to cross-examine a prosecution witness and thereby expose any information relating to the reliability of the witness. *Davis v. Alaska*, 415 U.S. 308, 315–16, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). However, the right to cross-examine allows the defendant "an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Pennsylvania v. Ritchie*, 480 U.S. 39, 53, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987) (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985) (emphasis in original)). Trial judges may impose limits on cross-examination based on concerns about harassment, prejudice, confusions of the issue, the witness's safety, and interrogation that is repetitive or only marginally relevant. *Van Arsdall*, 475 U.S. at 679, 106 S.Ct. 1431.

*Brown v. Dretke*, 419 F.3d 365, 375-76 (5th Cir. 2005).

Furthermore, as the Louisiana Fourth Circuit correctly determined, Confrontation Clause violations are subject to a harmless-error analysis.[11] *Fry v. Pliler*, 551 U.S. 112, 116

---

[11] "The test for whether a federal constitutional error was harmless depends on the procedural posture of the case. On direct appeal, the harmlessness standard is the one prescribed in *Chapman* [*v. California*], 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 [ (1967) ]: '[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.' *Id.* at 24, 87 S.Ct. 824." *Davis v. Ayala*, 135 S.Ct. 2187, 2197-98 (2015). The Louisiana Fourth Circuit applied the proper standard, stating that "an error is harmless if it can be said beyond a reasonable doubt that the guilty verdict rendered in the case was surely unattributable to that error."

(2007) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993)); *Fratta v. Quarterman*, 536 F.3d 485, 507 (5th Cir. 2008). Under the *Brecht* standard, which governs federal habeas review, *see Davis v. Ayala*, 135 S.Ct. 2187, 2197-98 (2015), the question is whether the error "had a substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson,* 507 U.S. at 637. In assessing the error, federal habeas courts consider the following factors:

> [T]he importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and of course, the overall strength of the prosecution's case.

*United States v. Edwards*, 303 F.3d 606, 623 (5th Cir. 2002) (citation omitted). The United States Fifth Circuit offered the following guidance in making the determination under *Brecht*:

> [U]nder *Brecht*, a constitutional trial error is not so harmful as to entitle a defendant to habeas relief unless there is more than a mere reasonable possibility that it contributed to the verdict. It must have had a substantial effect or influence in determining the verdict. We recognize, however, that if our minds are "in virtual equipoise as to the harmlessness," under the *Brecht* standard, of the error, then we must conclude that it was harmful. *O'Neal v. McAninch*, 513 U.S. 432, ––––, 115 S.Ct. 992, 994, 130 L.Ed.2d 947 (1995).

*Woods v. Johnson*, 75 F.3d 1017, 1026-27 (5th Cir. 1996).

In *Davis v. Ayala*, *supra*, the Supreme Court explained that because a state court's determination that a constitutional error was harmless on direct review constitutes an adjudication of the constitutional claim "on the merits," the deferential standards of review set forth in 28 U.S.C. § 2254(d) necessarily apply. The Court reasoned:

When [the state court's] *Chapman* decision is reviewed under AEDPA, "a

_____

*Hatfield*, 155 So.3d at 592; *see also Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993).          .

federal court may not award habeas relief under § 2254 unless *the harmlessness determination itself* was unreasonable." *Fry, supra*, at 119, 127 S.Ct. 2321 (emphasis in original). And a state-court decision is not unreasonable if " 'fairminded jurists could disagree' on [its] correctness." [*Harrington v.*] *Richter*, [562 U.S. 86,] 101, 131 S.Ct. 770[, 178 L.Ed.2d 624 (2011) ] (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004)). [The petitioner] therefore must show that the state court's decision to reject his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." 562 U.S., at 103, 131 S.Ct. 770.

In sum, a prisoner who seeks federal habeas corpus relief must satisfy *Brecht*, and if the state court adjudicated his claim on the merits, the *Brecht* test subsumes the limitations imposed by AEDPA. *Fry, supra*, at 119-120, 127 S.Ct. 2321.

*Davis*, 135 S.Ct. at 2199.

Here, the trial court prohibited defense counsel from impeaching Dr. Tracy with references on lividity contained in a textbook, *Medicolegal Investigation of Death* by Werner Spitz, which he claims impeded his ability to fully cross-examine the witness in violation of his right of confrontation.    Hatfield argues the trial court improperly sustained the State's objection because the evidence was admissible under Louisiana Code of Evidence article 803(18), as an exception to the hearsay rule.    His principle concern, however, is that the restriction prevented the defense from fully exploring the expert witness' knowledge and conclusions.    Specifically, Hatfield argues that it prevented the defense from challenging the accuracy of his time-of-death conclusion—an issue crucial to Hatfield's alibi defense because he was in the hospital being treated for a gunshot wound in the early morning hours on the day in question.    He alleges that if the defense had been allowed to impeach Dr. Tracy with the lividity time-frame, jurors likely would have viewed his testimony as to the time of death with skepticism and found his conclusion implausible.    The State counters

25

that the state evidentiary ruling is not a cognizable claim on federal habeas review, and that the state courts properly held that any error in limiting cross-examination was harmless.

Initially the Court notes that to the extent Hatfield may be contesting the propriety of the state court's ruling under state evidentiary law in this proceeding, that claim is not cognizable.   "'[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.'"   *Trevino v. Johnson*, 168 F.3d 173, 184 (5th Cir. 1999) (quoting *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991)).   Federal *habeas corpus* relief may be granted only to remedy violations of the Constitution and laws of the United States— mere violations of state law will not suffice.   28 U.S.C. § 2254; *Engle v. Isaac*, 456 U.S. 107, 119 (1983).   In contrast, his claim that the ruling limiting cross-examination of the witness violated the federal constitution is properly before this Court for review.   However, even assuming, *arguendo*, that the trial court improperly limited cross-examination, any error was harmless.

The state courts reasonably determined that any error in restricting his ability to impeach Dr. Tracy with a textbook time-frame for when lividity becomes fixed was harmless. Hatfield argues that impeaching him with a scientific declaration that lividity is fixed within eight to ten hours of death would have led the jury to reject as a "scientific impossibility" Dr. Tracy's conclusion that even 4:00 a.m. could not be excluded as a possible time of death.[12]

---

[12] The formal proffer offered by the defense detailed cross-examination questions that would have been posed to Dr. Tracy based upon the textbook.   The defense did not proffer the statement itself, but referenced the purported fact that lividity is fixed *eight to twelve hours* under average temperature conditions.   The defense sought to establish that if the victim was found at 8:00 p.m. and dual lividity was present on the body upon autopsy, it suggests that he most likely died within 12 hours of when his body was moved, or at the

Thus, he concludes there was reasonable doubt as to whether or not his conviction resulted from this error.[13]    However, foreclosing the defense from referencing textbook statements on cross-examination did not substantially influence the verdict in this case.

The textbook time-frame had marginal relevance and was cumulative of other testimony adduced at trial from other expert witnesses.    Dr. Tracy repeatedly testified that estimating the time of death based on lividity was *not* a scientific determination.    He explained that lividity, along with rigor mortis, merely helps to develop a wide-range estimate as to time of death, which could best be characterized as a "crude guess" or "crude judgment call."[14]    His testimony clearly showed that no matter the window for fixed lividity, time of death could not be calculated to an absolute scientific certainty.    Dr. Tracy himself estimated a range somewhere between a minimum of four to six hours but up to twelve to fourteen hours for the time of death from when the victim's body was discovered around 8:00 p.m.    Even so, defense counsel effectively narrowed the scope and successfully adduced from Dr. Tracy his opinion that the victim died around 11:00 a.m. or 12:00 noon based on lividity, with a probable range between 9:00 a.m. and 4:00 p.m., but not excluding as a possibility as early as 4:00 a.m. or 5:00 a.m.[15]    As the court of appeal noted, this ultimate conclusion was therefore entirely consistent with the "Spitz treatise."    For this

---

earliest approximately 9:00 a.m.    *See* State Rec., Vol. 1 of 9, Defense Proffer.

[13]    Rec. Doc. 3-1, pp. 17-18.

[14]    State Rec., Vol. 6 of 9, Trial Transcript (Dr. Richard Tracy), pp. 63-65.

[15]    *Id.* at 84.

reason, textbook statements regarding the time lividity is fixed would have been of limited value in discrediting his testimony.    Furthermore, while it is true that Dr. Tracy's testimony at trial differed from his opinion offered to the defense before trial regarding estimated ranges for possible time of death, the defense was given ample opportunity to thoroughly cross-examine him regarding the discrepancy with his earlier statement and opinion.[16]

Additionally, the jury was made aware of the referenced lividity time-frame set out in the Spitz textbook.    The information was adduced by the defense near the end of trial during cross-examination of the State's rebuttal witness, Dr James Traylor.    The jury therefore was able to consider that information in weighing the evidence and rendering a verdict.[17]    Dr. Traylor acknowledged the textbook referenced that lividity became fixed after eight to twelve hours, but noted that those times were dependent on a variety of factors. Like Dr. Tracy, he also was unable to exclude the possibility that death occurred as early as 5:00 a.m., particularly considering that the victim did not expire immediately from his wounds.

Dr. Tracy's testimony coincided with that of the other medical expert witnesses in that none could definitively rule out that the victim died in the early morning hours.    In discussing the overall strength of the State's case when analyzing sufficiency of the evidence on direct appeal, the appellate court noted that not a single medical expert, including Dr. Tracy, was able to exclude the possibility that the victim was killed between 5:00 a.m. and

---

[16]    State Rec., Vol. 1 of 9, Exhibit D-1.    *See also* State Rec., Vol. 6 of 9, pp. 67-74.

[17]    State Rec., Vol. 7 of 9, Trial Transcript, pp. 225-235.

5:30 a.m.:

> The medical experts in this case testified as to the difficulty in estimating the victim's time of death. However, the State is correct that the three forensic pathologists who testified, two on behalf of the State and one on behalf of defendant, all stated that based on the physical evidence, they could not exclude the possibility that the victim was killed between 5:00 a.m. and 5:30 a.m.

> Defendant's cell phone records show that his cell phone pinged off cell towers close to or in eastern New Orleans from 4:45 a.m. until 6:07 a.m. In the interim, at 4:49 a.m., defendant's cell phone pinged off the Michoud Boulevard tower in eastern New Orleans when he called Ms. Whitley and left a voice message. At 5:05 a.m. and 5:35 a.m. defendant's cell phone pinged off the NASA cell tower. This thirty-minute period is when the State theorized that defendant killed the victim. Defendant's cell phone records further demonstrated that after the 5:35 a.m. call, defendant remained in eastern New Orleans until a 6:07 a.m. call pinged off the Chef Menteur Highway cell tower. A 6:08 a.m. call from defendant's phone to Ms. Spikes' phone pinged off the Louisa Street tower. The next call from defendant's phone, made at 6:10 a.m. to Mr. Brown's cell phone, pinged off the Fair Grounds cell tower. It was in this phone conversation that defendant told Mr. Brown he "got into it" with the person messing with his "baby momma" and also that he had been shot. In the 7:25 a.m. phone conversation with Ms. Spikes, defendant told her that he had been shot and was talking to the police. This established that defendant was already at East Jefferson Hospital at 7:25 a.m., speaking with Dep. Hillburn.

> Furthermore, the record is replete with evidence that contradicts defendant's story that he was shot in the leg by Hispanic men after returning to his Metairie apartment complex. Dr. Traylor testified that given the characteristics of wound, and the fact that there was no bullet hole in defendant's clothing, he opined that it was more probable that the gun discharged while defendant was carrying it. Additionally, as described above, Det. Gray testified regarding numerous inconsistencies in defendant's account of the parking lot shooting.

For the foregoing reasons, any error in foreclosing the defense from cross-examining and impeaching Dr. Tracy with a textbook statement about lividity did not have a substantial and injurious effect or influence in determining the jury's verdict in this case. The information added little to the case given that Dr. Tracy's ultimate conclusion on the time of death actually benefitted the defense. The information was cumulative and actually placed

before the jury even if not during Dr. Tracy's testimony.     None of the experts, including Dr. Tracy, could emphatically rule out the State's theory as to the time of death.     Additionally, the evidence of Hatfield's guilt was substantial.     Thus, the state court reasonably determined that even if the trial court erred in limiting cross-examination of Dr. Tracy by not allowing reference to a learned treatise, that error was ultimately harmless.     Accordingly, Hatfield is not entitled to relief on this claim.

B.  *Limitation on Cross-Examination of Searle Brown and Shante Whitley*

Hatfield claims that his Sixth Amendment right to confront witnesses was denied when the trial court improperly restricted his cross-examination of Searle Brown and Shante Whitley, preventing him from establishing potential bias.[18]     He contends he was unable to inquire about other criminal matters pending against these witnesses that could have influenced their testimony in this case.

The Louisiana Fourth Circuit considered and rejected this claim on direct review, reasoning:

> In this assignment of error, defendant argues that the trial court erred in sustaining a State objection and preventing the defense from asking Mr. Brown about an alleged open warrant for his arrest that existed at the time he testified at trial and in sustaining a State objection and preventing the defense from cross examining Ms. Whitley as to an alleged pending felony charge.

> Defendant does not point to any place in the record that substantiates his assertion that Mr. Brown had an open warrant for his arrest or that Ms. Whitley had a pending felony charge against her.

---

[18]  As mentioned previously, to the extent Hatfield may be contesting the propriety of the state court's ruling under state evidentiary law in this proceeding, that claim is not cognizable.     Federal habeas corpus relief may be granted only to remedy violations of the Constitution and laws of the United States—mere violations of state law will not suffice.     28 U.S.C. § 2254; *Engle*, 456 U.S. at 119.

During cross examination of Ms. Whitley, defense counsel asked whether she had her own court case that day. The State objected. The objection was sustained. Defense counsel asked to approach the bench. An unrecorded bench conference was held, after which the trial court directed that trial proceed.

Extrinsic evidence to show a witness's bias or interest is admissible to attack the credibility of the witness. La. C.E. art. 607(D). La. C.E. art. 609.1(A) provides that, in a criminal case, every witness by testifying subjects himself to examination relative to her criminal convictions. However, generally, only offenses for which the witness has been convicted are admissible upon the issue of the witness's credibility, and no inquiry is permitted into matters for which there has only been an arrest, the issuance of an arrest, an indictment, a prosecution, or an acquittal. La. C.E. art. 609.1(B).

However, "[d]enying an accused the right to cross-examine a state's witness as to a pending criminal charge in order to show possible bias may deny him not only his right of cross-examination, but also his constitutional right of confrontation." Pugh, Force, Rault & Triche, Handbook on Louisiana Evidence Law, Authors' Note (2) to La. C.E. art. 609.1, p. 564 (2013). Encompassed in the right of confrontation is the right of the accused to impeach a witness for bias or interest; the right to expose a witness's motivation in testifying is a proper and important function of the constitutionally protected right of cross examination. *State v. Lawrence*, 2008–0397, p. 9 (La. App. 4 Cir. 2/4/09), 5 So.3d 896, 902.

"It is well-settled that '[a] witness's bias or interest may arise from arrests or pending criminal charges, or the prospect of prosecution, even when he has made no agreements with the state regarding his conduct.' " *State v. Burbank*, 2002–1407, p. 2 (La. 4/23/04), 872 So.2d 1049, 1050 (quoting *State v. Vale*, 95–1230, p. 4 (La. 1/26/96), 666 So.2d 1070, 1072). A witness's "hope or knowledge that he will receive leniency from the state is highly relevant to establish his bias or interest." *Vale*, 95–1230, p. 4, 666 So.2d at 1072 (quoting *State v. Brady*, 381 So.2d 819, 822 (La. 1980)). "The possibility that the prosecution may have leverage over a witness due to that witness'[s] pending criminal charges is recognized as a valid area of cross-examination." *Burbank*, 2002–1407, p. 2, 872 So.2d at 1050 (quoting *State v. Rankin*, 465 So.2d 679, 681 (La.1985)).

In the case of Ms. Whitley, she corroborated Ms. Spikes' testimony regarding the events that occurred in the early morning hours of April 10, 2010. Ms. Whitley confirmed that defendant followed her vehicle that morning until she and Ms. Spikes' were able to evade him, and that defendant called Ms. Spikes numerous times during those early morning hours. Ms. Whitley also testified

that defendant called and left a voicemail message on her cell phone. A recording of that voicemail was identified by Ms. Whitley and was played for the jury.

Generally, a trial court's ruling as to the admissibility of evidence will not be disturbed absent an abuse of discretion. *Cyrus*, *supra*. Ms. Whitley was Ms. Spikes' close friend, whom she had known for sixteen years. If she was going to testify falsely against defendant, who had mistreated Ms. Spikes and possibly murdered Ms. Spikes' boyfriend, one can surmise that their close friendship would have been an overriding motive to do so. Thus, the trial court could have reasonably concluded that the probative value of any evidence of such a pending charge against Ms. Whitley was minimal, and that defendant's constitutional right to confrontation did not require that the general rule that only evidence of convictions is admissible to attack the credibility of a witness in a criminal case be dispensed with.

Assuming for the sake of argument that the trial court did err in sustaining the State's objection to cross examination of Ms. Whitley as to a pending charge of aggravated battery, confrontation violations are subject to harmless error analysis. *Scott*, *supra*; *Jones*, *supra*.

For the reasons discussed above, and noting that the most damaging piece of testimony by Ms. Whitley related to the voicemail message left by defendant on her cell phone, a fact supported by independent evidence, it can be said beyond a reasonable doubt that the guilty verdict actually rendered in the instant case was surely unattributable to any such error.

As to the defendant's complaint that the trial court erred in sustaining the State's objection to the cross examination of Mr. Brown as to whether he then had a warrant out for his arrest. The State represents that Mr. Brown's "open warrant" was for failure to pay fines and fees in Baton Rouge. Mr. Brown admitted to prior convictions for forgery and possession of cocaine, and he was on parole. Importantly, Mr. Brown's parole officer, Officer Ramsey, replied in the negative when asked on direct examination whether she ever had to violate Mr. Brown's parole, and as to whether he had done anything to violate his parole in the three years she had been supervising him. The defense had no questions for Officer Ramsey.

If the matter of which defense counsel sought to question Mr. Brown about was serious enough to undermine his credibility, it can be presumed that his parole officer would have known of it and that it would have constituted a parole violation. This supports the State's representation in its appellate brief that the matter concerned only Mr. Brown's failure to pay fines and fees in Baton Rouge. Defendant has failed to show that the trial court abused its

discretion in sustaining the State's objection as to the question concerning whether Mr. Brown had a warrant outstanding for his arrest.

Even assuming that the trial court abused its discretion in sustaining the State's objection, considering the State's representation that the supposed "open warrant" was for Mr. Brown's failure to pay fines and fees in Baton Rouge; that he was on parole; that his parole officer confirmed that he had never violated the terms of his parole; and all of the other facts and circumstances of the case, it can be said beyond a reasonable doubt that the guilty verdict actually rendered in the instant case was surely unattributable to any such error.

There is no merit to this assignment of error.

The Louisiana Supreme Court likewise denied relief without assigning additional reasons.

The record shows that defense counsel had no opportunity to cross-examine Ms. Whitley about a purported pending criminal charge against her in another section of court. The trial court sustained the State's objection when defense counsel asked if she "had [her] own court case today."[19]    Defense counsel noted her objection for the record.    According to the motion for new trial, the defense had learned through investigation about an open felony charge of aggravated battery that was pending when she testified at trial.[20]    In denying the claim on direct appeal, the appellate court surmised that Ms. Whitley already had a motive to testify falsely—her 16-year friendship with Ms. Spikes—and therefore, the trial court could have reasonably found the evidence of the pending criminal charge was only minimally probative, justifying the restriction on cross-examination and the right of confrontation.    This rationale appears questionable given that a defense inquiry into

---

[19]    State Rec., Vol. 6 of 9, Trial Transcript (Shante Whitley), pp. 165-166.

[20]    State Rec., Vol. 1 of 9, Motion for New Trial.

pending criminal charges against a critical witness for the State, regardless of whether other motives to lie may exist, seems relevant and proper on cross-examination.    Nevertheless, the appellate court recognized that even assuming for the sake of argument the trial court did err in sustaining the State's objection to cross-examination of Ms. Whitley, confrontation violations are subject to harmless-error analysis, and here the error was indeed harmless. This Court finds that conclusion was reasonable because the error did not have a substantial and injurious effect or influence in determining the jury's verdict for the reasons expressed by the Louisiana Fourth Circuit.

The majority of Ms. Whitley's testimony was cumulative to Ms. Spikes' testimony. The most damaging part of her testimony about the phone call and voicemail left by Hatfield on her mobile phone at 4:49 a.m. on the day of the murder, was also cumulative of objective evidence introduced at trial.    The State introduced the independently verifiable phone records which reflected Hatfield's calls to Ms. Whitley's mobile phone, as well as the *actual* voicemail recording that was played for the jury.    The evidence presented plainly corroborated Ms. Whitley's testimony on material points.    Thus, the Court finds that the trial court's limitation on the cross-examination of Ms. Whitley did not have a substantial impact on the determination of Hatfield's guilt.

With regard to Mr. Brown's testimony, the appellate court determined there was no abuse of discretion in limiting cross-examination about a purported open warrant stemming from his failure to pay fines and fees in Baton Rouge.    The appellate court appears to have surmised that the information perhaps was not probative or serious enough to undermine the witness' credibility in order to justify the trial court's ruling.    Regardless, the appellate

court also concluded that any error in limiting cross-examination was harmless.     Hatfield argues that he should have been allowed to question whether Brown might "hope" that the Orleans Parish prosecutors would put in a good word with their out-of parish counterparts or otherwise assist him in having the warrant recalled.[21]

Hatfield had ample opportunity to expose potential bias or motivation on the part of Mr. Brown for testifying.     The record shows that the trial court imposed a minor limitation, rather than sweeping curtailment on cross-examination.     The State initially brought out on direct examination Mr. Brown's prior convictions and the fact that he was currently on parole and would be for several more months.     Defense counsel had the opportunity to explore these topics at length with Mr. Brown during her cross-examination, searching for information that would suggest bias or motivation for his testimony, before she asked about the open warrant.[22]     At this point, she inquired of Mr. Brown:     "And you actually currently have a warrant out for your arrest, correct?"     Mr. Brown replied, "I do?"[23]     The State's objection was sustained and the record does not reflect any objection by defense counsel to that ruling.     On redirect, the State asked Mr. Brown if he had any open charges.     He replied, "None that I know of, but she just said something about I have a warrant and I'm trying to find – I would like to find out more about it."[24]     Following his testimony, the State

---

[21]  Rec. Doc. 3-1, p. 24.

[22]  State Rec., Vol. 7 of 9, Trial Transcript (Searle Brown), pp. 127-133.

[23]  *Id*. at 132-133.

[24]  *Id*. at 140-141.

called his parole officer to testify.    She testified he had no parole violations.    Defense counsel did not conduct any cross-examination of that witness.

As the record shows, defense counsel had already elicited a significant amount of information that could damage his credibility.    Mr. Brown testified repeatedly that he was unaware of any open warrant, which made it unlikely that it could have influenced his testimony.    Finally, the purported open warrant in Baton Rouge based on outstanding fees and fines was relatively insignificant, as recognized by the appellate court.    The record shows that the trial court merely limited cross-examination about a matter that Mr. Brown maintained he knew nothing about and that had minimal relevance under the circumstances. Hatfield has not shown that the limitation on cross-examination had a substantial or injurious effect or influence on the verdict.

For the reasons expressed, the state courts' finding of harmless error and denial of relief were neither contrary to, nor an unreasonable application of, Supreme Court precedent.    Accordingly, Hatfield is not entitled to habeas relief.

## **RECOMMENDATION**

**IT IS RECOMMENDED** that Hatfield's application for federal *habeas corpus* relief be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such

consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); *Douglass v. United*

*Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[25]

New Orleans, Louisiana, this ___15th___ day of _____August_____, 2017.

**MICHAEL B. NORTH**
**UNITED STATES MAGISTRATE JUDGE**

---

[25] *Douglass* referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.